**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| ANTHONY NANCE and | ) | |
| BETTIE NANCE | ) | |
|    Plaintiffs, | ) | |
| | ) | |
|    v. | ) | No. 06 CV 6608 |
| | ) | Judge Blanche M. Manning |
| CITY OF ELGIN, an Illinois municipal | ) | |
| corporation, ED SCHOCK, individually, | ) | |
| WILLIAM MILLER, individually, and | ) | |
| RICHARD KOZAL, individually, | ) | |
| **Defendants.** | ) | |

**MEMORANDUM AND ORDER**

Plaintiffs Anthony and Bettie Nance owned Anthony's Restaurant and Jazz Club in Elgin, Illinois. They sued the city of Elgin, mayor Ed Shock, police chief William Miller, and city attorney Richard Kozal for conspiring to violate their constitutional rights under 42 U.S.C. § 1983. The Nances contend that a series of racially discriminatory actions conducted by the defendants cost them their liquor license and forced them into bankruptcy. Defendants filed a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6). For the following reasons, the motion is denied.

**I. Background**

The following facts are drawn from the Nance's complaint and are accepted as true for the purposes of the motion to dismiss. *See Savory v. Lyons*, 469 F.3d 667, 670 (7th Cir. 2006).

In September 2002, Anthony and Bettie Nance set out to acquire a liquor license for their new jazz club. They met with Elgin mayor Ed Shock, who also happened to be on the city's liquor control commission. Shock told them that the city issued liquor licenses only to those

establishments that also served food. At the time, Anthony and Bettie Nance had not planned to serve food at the jazz club because of the added start-up costs.

Nevertheless, the Nances gave a presentation to the Elgin city council detailing their plans to open a jazz club with live music and dancing, as well as a restaurant and banquets. The city subsequently issued a class U liquor license, which required the club to serve food in addition to liquor. Anthony and Bettie Nance contend that similarly-situated business owners who were not African-American were granted liquor licenses that did not require food service.

Anthony and Bettie Nance opened their jazz club on April 3, 2003, investing much time and money into the venture. The Nances allege that at some point after the opening, Shock and city attorney Richard Kozal told them that the club's clientele was not wanted in the city and referred to the club's guests as "those people." They claim that Shock also blamed the jazz club for poor attendance at a new municipal recreation center. Additionally, the Nances state that Kozal said he had advised against the club and drafted the class U liquor license to control the nature of the jazz club's business.

On December 3, 2003, police waited outside the jazz club following a well-attended show. The Nances state that there were no calls to the police, but that about fifteen squad cars waited outside the facility and that several of the jazz club's patrons complained to the Elgin city council. The Nances contend that similarly-situated club owners who are not African-American and do not have a substantial African-American clientele are not subjected to similar displays of police force.

Following the December incident, the Nances contend that the city of Elgin and the Elgin police department acted in collusion to harass them and force the closure of the jazz club. They

state that the police department placed undercover officers within the jazz club, sent underage customers to entrap the club into serving liquor to minors, and maintained a continuous police presence near the exterior of the jazz club. The Nances contend that similarly-situated bar owners who were not African-American did not encounter the same level of harassment by the police.

On June 4, 2004, a shooting occurred near the parking lot as patrons exited the club. Though about fifteen police officers were present, they did not assist in clearing the area because they said they had been told not to "interfere" with the jazz club after the December incident. Anthony and Bettie Nance agreed to pay for the expense of an on-site police officer to avoid closure until a police investigation was completed. They claim that they were led to believe that the officer would only need to staff the establishment for a two-week period. After two weeks, the city of Elgin refused to remove the officer and continued to charge the Nances for the officer's presence. The Nances contend that similarly-situated bar owners who are not African-American have not been forced to pay for a police presence at their establishments.

On October 6, 2004, the city of Elgin filed a complaint before the liquor control commission of the city of Elgin to attempt to revoke the jazz club's liquor license for the violation of several municipal ordinances. The alleged violations included: that patrons could sneak alcohol outside the club; that patrons were allowed to enter the club as late as 1:58 a.m. even though the club was supposed to close at 2:00 a.m.; and that there was "mob action" in the parking lot on several occasions.

Just a month later, on November 10, 2004, the city of Elgin filed a complaint in state court in Kane county, alleging that Anthony and Bettie, Inc., the Nances' corporation which

owned the restaurant, erected a large sign without obtaining the proper city permit.  Immediately following the complaint, Anthony Nance filed an application for a sign permit but received no response.  The city of Elgin then sought to level a $500.00 fine for each day of the violation.  On February 14, 2005, the city of Elgin and Anthony Nance entered a stipulation and agreed order to pay a fine of $500, plus $75 in costs, on the condition that the Nances' corporation came into compliance with the sign ordinance by March 14, 2005.

In an attempt to seek a resolution with the city over the liquor license dispute, on December 1, 2004, Anthony and Bettie Nance entered into a stipulation and agreed order with the city of Elgin.  Under the agreed order, the Nances agreed to pay a fine, to a seven day suspension of the club's liquor license, and to revocation of the club's liquor license if one more violation occurred before April 1, 2005.  The Nances contend that Kozal instructed them not to retain an attorney during this process.  Several days after signing the agreed order, an Elgin police officer observed three separate fights in the parking lot of the jazz club.

On December 7, 2004, the city of Elgin filed a complaint with the city's liquor control commission to have the jazz club's liquor license revoked based on violation of the agreed order.  The Elgin liquor control commission revoked the jazz club's liquor license on December 14, 2004, forcing the jazz club to close.

The Nances appealed the decision to the Illinois liquor control commission, and on April 5, 2005, the state commission ruled that the jazz club should have received only a thirty day suspension, not a revocation.  According to Anthony and Bettie Nance, the proceedings to revoke the liquor license forced them to close the jazz club for three months, leading them to file for bankruptcy, which resulted in the jazz club's permanent closure.

## II.     Discussion

Section 1983 provides relief in the federal courts for the "deprivation, under color of law, of a citizen's rights, privileges, or immunities secured by the Constitution or laws of the United States." 42 U.S.C. § 1983. To establish a claim under § 1983, the Nances must show that (1) the defendant acted under color of state law or invoked state authority, and (2) deprived the plaintiff of a constitutionally protected right. *Savory*, 469 F.3d at 670. Section 1983 does not provide substantive rights but is "an instrument for vindicating federal rights conferred elsewhere," and the court must first evaluate which of the plaintiff's constitutional rights was violated. *See Spiegel v. Rabinowitz*, 121 F.3d 251, 254 (7th Cir. 1997). The Nances allege that they were deprived of their rights under the 14th amendment, which provides that the state may not "deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction equal protection of the laws."

The defendants argue that under Rule 12(b)(6), they are entitled to dismissal of the Nances' § 1983 claims for three reasons: (1) defendants Shock and Kozal are entitled to absolute immunity; (2) the Nances' claims are untimely; and (3) the claims are barred under the doctrine of *res judicata*. In reviewing the defendants' motion, the court must accept the allegations in the complaint as true and draws all reasonable inferences in favor of the plaintiff. *See Savory*, 469 F.3d at 670. Additionally, the court will grant the motion only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957).

### A. Immunity

The defendants argue that Schock and Kozal are shielded by absolute immunity because Schock acted in his capacity as liquor control commissioner while Kozal acted in his capacity as a government prosecutor. The defendants have not asserted that absolute immunity shields police chief Miller or the city of Elgin from liability, and have not advanced any argument asserting qualified immunity, so the court will focus only on Schock and Kozal's arguments about absolute immunity.

In deciding whether to revoke or suspend a liquor license, a local liquor commissioner acts in a judicial capacity, and therefore his decisions are shielded by absolute immunity. *See Reed v. Vill. of Shorewood*, 704 F.2d 943, 951 (7th Cir. 1983). Likewise, a government attorney is entitled to absolute immunity for his or her role in initiating proceedings against another party for municipal or criminal violations. *See Smith v. Power*, 346 F.3d 740, 742 (7th Cir. 2003) (attorney entitled to absolute immunity when acting as an "advocate for the State."). However, the extent to which absolute immunity shields their decisions is not unlimited—it applies only to those decisions or acts that are judicial or prosecutorial in nature. *See Reed*, 704 F.2d at 951; *Smith*, 346 F.3d at 742 (a government attorney does not enjoy absolute immunity when his or her actions are investigative or "unrelated to the preparation and initiation of judicial proceedings.").

Turning now to the allegations in the complaint, the Nances have alleged that, as liquor control commissioner, Schock participated in and was the "controlling influence" in the commission's decision to revoke the jazz club's liquor license. Because such conduct is judicial in nature, *see Reed*, 704 F.2d at 951, Schock is entitled to absolute immunity for his participation in the commission's decision. Similarly, Kozal is entitled to absolute immunity for his role in

initiating the liquor control commission proceedings against the jazz club that resulted in the revocation of the license. *See Power*, 346 F.3d at 742 (attorney entitled to absolute immunity when acting as an "advocate for the State.").

However, the fact that Schock and Kozal are immune for their judicial or prosecutorial roles in the conspiracy does not mean that they have escaped liability entirely. The complaint also alleges that they participated as co-conspirators in roles not shielded by judicial or prosecutorial immunity. Specifically, the complaint alleges that Shock was acting as mayor when he dispatched police officers to the jazz club to harass patrons, and that Kozal was not acting as a prosecutor when he required the Nances to install a kitchen and serve food in order to obtain a liquor license. The defendants contend those allegations are untimely and therefore irrelevant because the alleged conduct occurred beyond the relevant statute of limitations period. But, as discussed in more detail below, while the Nances may not recover damages for conduct that occurred outside the limitations period, they may nevertheless use evidence of untimely conduct to show that Schock and Kozal participated in the conspiracy in ways that are not shielded by absolute immunity.

### B. Statute of Limitations

Next, the defendants argue that the complaint must be dismissed because the conduct alleged occurred outside the limitations period. Section 1983 claims are governed by the statute of limitations for personal injury claims in the state where the injury occurred. *See Palmer v. Bd. of Educ. of Cmty. Unit Sch. Dist. 201-U, Will County, Ill.*, 46 F.3d 682, 684 (7th Cir. 1995). In Illinois, the statute of limitations for such claims is two years. *Id.;* 735 Ill. Comp. Stat. 5/13-202. The Nances filed their complaint on November 30, 2006, and defendants argue that any claims

based on actions or events that occurred before November 30, 2004, are barred by the two-year statute of limitations. The Nances contend that the doctrine of continuing violations applies, under which their claim did not accrue until the date of the revocation of their liquor license, which was the culmination of all of the defendants' prior discriminatory conduct.

As a threshold matter, the plaintiffs' reliance on the doctrine of continuing violations is misplaced. Under the doctrine, plaintiffs can rely on conduct that occurred beyond the relevant limitations period if the wrongfulness of the untimely conduct was not immediately apparent, *see Savory v. Lyons*, 469 F.3d 667, 672-73 (7th Cir. 2006), or where the defendant's conduct can be characterized as a continuous series of related events which "gives rise to a cumulative injury." *Heard v. Sheahan*, 253 F.3d 316, 319 (7th Cir. 2001). If applicable, the doctrine permits a plaintiff to recover even for damages that occurred beyond the limitations period.

The doctrine is inapplicable to this case because the conduct which allegedly injured the Nances—revocation of the jazz club's liquor license—occurred within the two-year limitations period. Therefore, there is no need to alter the accrual date of their claim because, even without the benefit of the continuing violation doctrine, their claim accrued within the two-year period preceding their lawsuit.

Although the defendants concede that the revocation of the jazz club's liquor license occurred within the two-year limitations period, they contend that the revocation is irrelevant because they were not responsible for it—the license was revoked by the liquor commission, not by any of them. However, the complaint alleges a conspiracy, the aim of which was to create troubles at the jazz club with the hope that the liquor control commission would eventually revoke the club's liquor license. Co-conspirators are liable for conduct undertaken in furtherance

of the conspiracy, even if they did not personally engage in the conduct. *See United States v. Rogan*, 459 F. Supp. 2d 692, 719 (N.D. Ill. 2006) (conspirator liable for acts of co-conspirators undertaken in furtherance of the conspiracy). Therefore, as co-conspirators the defendants may be liable for the revocation of the liquor license even though they did not personally participate in the revocation. This is true even though the entity that did revoke the liquor license—the liquor control commission—is not named in the complaint as a defendant, and is potentially immune. *See Brucar v. Rubin*, 618 F.2d 987, 992-94 (7th Cir. 1980) (reversing dismissal of a § 1983 complaint alleging a conspiracy between private citizens and a judge where the judge was immune and not named as a defendant).

As for the defendants' allegedly wrongful conduct that occurred before the two-year limitations period, those allegations are not irrelevant just because they concern conduct that is untimely. The Nances allege the earlier conduct by Shock and Kozal to establish that they participated in the conspiracy in roles other than as liquor control commissioner or prosecutor. Even untimely conduct is relevant to the extent it serves as "background evidence in support of a timely claim." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002). Therefore, the Nances' allegations are relevant, and serve to establish Schock's participation in the conspiracy as mayor and Kozal's role in issuing the jazz club's liquor license. Thus, as discussed above, the allegations undermine the arguments by Schock and Kozal that they are shielded from all liability on the basis of absolute immunity.

In summary, the revocation of the jazz club's license occurred within the limitations period and, therefore, the defendants' argument that the Nances' allegations should be dismissed as untimely is unavailing.

B.   Doctrine of *Res Judicata*

The defendants also contend that the Nances' claims must be dismissed under the doctrine of *res judicata* because those same claims were (or could have been) addressed in prior state court proceedings. When a state court proceeding results in a final judgment that precludes further state proceedings, the doctrine of *res judicata* requires federal courts to grant the same preclusive effect. 28 U.S.C. § 1738; *Pirela v. Vill. of N. Aurora*, 935 F.2d 909, 911 (7th Cir. 1991). Accordingly, a claim brought in federal court must be dismissed if the defendant can show that: (1) "the law of the state in which the prior judgment is rendered would give that judgment preclusive effect against the claims asserted in the federal action," and (2) the opposing party received a "full and fair opportunity" to pursue his claims in the earlier proceedings. *Id.*

The defendants have identified two prior state court proceedings they contend preclude the Nances' federal claims: (1) the proceedings before the local and state liquor control commissions in which the jazz club's liquor license was revoked, later reduced to a suspension; and (2) the sign ordinance proceeding in state court in which the parties entered into an agreed order requiring the Nances to bring the jazz club's signage into compliance with zoning requirements. The court will analyze the preclusive effect of each proceeding in turn.

1.   The Local Liquor Commission and Illinois Liquor Control Commission Decisions

To determine whether the proceedings before the liquor control commissions preclude the Nances' § 1983 claims under the doctrine of *res judicata*, the court must first examine whether Illinois law would give preclusive effect to the commission decisions. Illinois courts have established a three-part analysis to determine whether a judgment or decision is preclusive: (1)

was there was a final judgment on the merits rendered by a court of competent jurisdiction; (2) was there an identity of issues; and (3) was there an identity of parties or their privies. *See River Park, Inc. v. City of Highland Park*, 703 N.E.2d 883, 889 (Ill. 1998). Even if an issue was not actually litigated in the prior proceeding, the proceeding will still have a preclusive effect on the issue if it *could have been* litigated. *See Hicks v. Midwest Transit, Inc.*, 479 F.3d 468, 472 (7th Cir. 2007).

Assuming that the commission decisions were final and that there was an identity of parties, the defendants arguments in favor of *res judicata* nevertheless falter on the second requirement—an identity of issues. The only issue presented to the commission was whether the jazz club's license should be revoked based upon alleged violations of Elgin's liquor laws. The issue raised in this case—whether those alleged violations were precipitated by the defendants' allegedly racist behavior—was never presented to or addressed by the commission. Nor could it have been. *See Esmail v. Macrane*, No. 94 C 380, 1995 WL 692023, at *7 (N.D. Ill. Nov. 16, 1995) (liquor control commission proceedings did not preclude § 1983 filed later in state court because commission could not have entertained § 1983 claims).

Alternatively, the defendants contend that the Nances should have appealed the liquor control commission's final judgment to state court, which could have entertained their § 1983 claims. They argue that the Nances' failure to do so amounted to a forfeiture of their § 1983 claims. In support, the defendants cite cases like *Holstein v. City of Chicago*, 803 F.Supp. 205, 210-11 (N.D. Ill. 1992), in which a plaintiff failed to seek state judicial review of an administrative agency decision, which precluded their attempt to seek judicial review in federal court. However, the cited cases are inapposite because the plaintiffs in those cases were

dissatisfied with the administrative agency's final decision and sought to overturn it. In contrast, by all accounts the Nances were pleased with the state liquor control commission's decision that the jazz club's license should have been suspended, not revoked. Because the Nances were not seeking to overturn the commission's decision, their situation is distinguishable from the situations presented in the cited cases.

Accordingly, the defendants have failed to establish *res judicata* on the basis of the liquor control commission proceedings.

### 2. The State Court Municipal Sign Ordinance Proceeding

Next, the defendants argue that the Nances could have asserted their § 1983 claims as counterclaims in the state court proceeding that the city of Elgin filed over a violation of a municipal sign ordinance. The city filed the suit in the circuit court of Kane county on October 22, 2004. The complaint alleged that the jazz club had positioned an exterior sign without first securing a permit. The city sought fines of $500 per day for each day the violation continued. The parties ultimately settled by entering into an agreed order.

The defendants' argument must be rejected because compulsory counterclaims do not exist under Illinois law. *See* 735 Ill. Comp. Stat. 5/2-608(a); *Peregrine Fin. Group, Inc. v. Martinez*, 712 N.E.2d 861, 868 (Ill. App. Ct. 1999). As a result, the decision not to assert counterclaims in one action does not serve as a "bar from raising them in a subsequent action." *Peregrine*, 712 N.E.2d at 867 (the defendant who did not raise a counterclaim in an earlier suit was not barred from asserting the claim as a plaintiff in a subsequent suit because under Illinois law, counterclaims are never compulsory).

Moreover, the defendants' argument must be rejected because they cannot establish an identity of issues under the *res judicata* analysis. Illinois courts have adopted the transactional test to determine whether issues are identical for *res judicata* purposes. *See River Park, Inc. v. City of Highland Park*, 703 N.E.2d 883, 893 (Ill. 1998). Under this analysis, claims are sufficiently similar if they arise from the same transaction or the "same core of operative facts." *Id.* at 894. Here, the set of operative facts relevant to whether the Nances violated Elgin's sign ordinance are not identical to the set of facts relevant to the revocation of the jazz club's liquor license. Nor were the sign violation and the license revocation the same transaction.

Accordingly, the defendants have also failed to establish *res judicata* on the basis of the zoning violation proceeding.

### III. CONCLUSION

For the reasons given, the defendants' motion to dismiss pursuant to Rule 12(b)(6) is denied. The parties shall report for a status hearing on August 21, 2007.

ENTER:

DATE: August 3, 2007

Blanche M. Manning
United States District Judge