**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| ANTHONY & BETTIE NANCE, | ) | |
| Plaintiffs, | ) | |
| | ) | No. 06 CV 6608 |
| v. | ) | Judge Blanche M. Manning |
| | ) | |
| CITY OF ELGIN, et al., | ) | |
| Defendants. | ) | |

**MEMORANDUM AND ORDER**

Plaintiffs Anthony and Bettie Nance used to run a jazz club in downtown Elgin, but allege that they were forced to shut it down because the club drew a predominantly African-American crowd. They have sued the city of Elgin, former police chief William Miller, and city attorney Richard Kozal, for violating their constitutional rights under the Fourteenth Amendment's Equal Protection Clause. *See* 42 U.S.C. § 1983. The defendants have filed a motion for summary judgment, arguing that the plaintiffs' claims are untimely, lack evidentiary support, and/or that immunity shields the defendants from liability. For the reasons that follow, the motion for summary judgment is granted in part and denied in part.

**BACKGROUND**

The following facts are undisputed except where noted.

In September 2002, Anthony and Bettie Nance met with Elgin mayor Ed Schock to obtain a liquor license for their new jazz club. Mayor Schock, who also happened to be on the city's liquor control commission, told them that no class A licenses were available, which would have permitted the club to serve only liquor. Instead, major Schock advised the Nances that the easiest way to obtain a liquor license would be to seek a class E liquor license, which required an establishment to generate no less than half of its revenue from the sale of food. At the time, Anthony and Bettie Nance contend that they had not planned to serve food at the jazz club because of the added start-up costs.

The Elgin city council eventually created a new class of liquor license (a class U license) for musical entertainment clubs, which required the club to generate no less 35% of their revenue from the sale of food. The liquor control commission granted the Nances the one and only class U license Elgin has issued to date.

Anthony and Bettie Nance opened their jazz club on April 3, 2003. The club apparently operated without incident until that November, when the city began reporting that criminal activity was occuring there, including disorderly conduct such as fights, as well as patrons

leaving the club with open bottles of alcohol.  The Nances deny the reports of criminal activity, and allege they were conconcocted by the defendants to force the closure of the jazz club.

On December 3, 2003, Chicago radio legend and renowned steppers artist Herb Kent performed at the club.  Kent drew a large crowd of followers to the club and, though there were no reports of incidents or problems, also drew a large police presence.  Indeed, fifteen squad cars were positioned around the facility as it closed and patrons left.  Some of those patrons attended the next Elgin city council meeting to complain that the large police presence left them feeling like they had been racially profiled.

Following the December incident, the city continued amassing a list of alleged violations of its municipal code by the jazz club.  Then on June 4, 2004, a shooting occurred near the jazz club.  Following the shooting, the Nances met with mayor Schock, police chief Miller, and city attorney Kozal.  According to the Nances, during the meeting Schock stated that he no longer wanted "those people" downtown, and Kozal admitted that he drafted the ordinance creating the U liquor license as part of his effort to control the jazz club.  The defendants deny that Schock or Kozal made such statements.  The Nances contend that Kozal also told them they must maintain a security detail at the club over the coming weeks or their license would be revoked, although the defendants contend that someone other than Kozal imposed that requirement on the Nances.

On October 6, 2004, the city of Elgin filed a complaint against the jazz club with the Elgin Local Liquor Control Commission based upon ten reports of municipal code violations it had amassed since November 1, 2003.  On December 1, 2004, the Nances signed a Stipulation and Agreed Order that settled the matters raised in the October 6, 2004, complaint and called for the city to close the jazz club if one more incident of criminal activity occurred at the club before April 2005.  However, the Nances contend that their signatures were coerced by the defendants when Kozal threatened to close the club if the Nances enlisted the help of an attorney or refused to sign the Stipulation and Agreed Order.

Four days after signing the Stipulation and Agreed Order, the defendants contend that a police officer witnessed a fight at the jazz club.  As a result, on December 7, 2004, the city filed a second complaint against the club with the Elgin Local Liquor Control Commission, asking that the club's license be suspended or revoked.  After viewing a videotape of the fight, the Commission revoked the club's license on December 17, 2004.  The Nances appealed the revocation to the Illinois Liquor Control Commission, which on April 5, 2005, reduced it to a thirty-day suspension.  However, the Nances' victory came too late to save their jazz club, which was already the subject of bankruptcy proceedings brought on by the loss of business following the December 17, 2004, revocation of their liquor license.

Just shy of two years after the revocation of their liquor license, the Nances sued the city of Elgin, mayor Schock, former chief Miller, and city attorney Kozal on November 30, 2006, for conspiring to violate their rights under the Equal Protection Clause.  Specifically, they contend that the defendants engaged in conduct that culminated with the revocation of their liquor license

on account of their race. They contend that non-minority bar owners were not subjected to unnecessary shows of force by police officers and did not have their liquor licenses revoked even though their bars had been cited for municipal code violations more frequently than had the jazz club. The Nances previously dropped their claim against mayor Schock. The defendants now seek summary judgment on the § 1983 claims against the remaining defendants the city (Count I), former chief Miller (Count III), and city attorney Kozal (Count IV).

## ANALYSIS

### I. Summary Judgment Standard

Summary judgment is proper when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of any material fact." Fed. R. Civ. P. 56(c). The court construes all of the facts and the reasonable inferences drawn from those facts in favor of the Nances. *See Warren v. Solo Cup Co.*, 516 F.3d 627, 629 (7th Cir. 2008). The Nances, however, may not merely rest upon the allegations or details in their pleadings, but instead, must set forth specific facts showing that there is a genuine issue for trial. *See Celotex*, 477 U.S. at 322.

### II. Statute of Limitations

The defendants' first argument in favor of summary judgment is identical to the argument they presented in favor of dismissal—that most of the allegedly discriminatory conduct at issue occurred more than two years before the filing of the complaint, and therefore falls outside the relevant statute of limitations period. *See Palmer v. Bd. of Educ. of Cmty. Unit Sch. Dist. 201-U, Will County, Ill.*, 46 F.3d 682, 684 (7th Cir. 1995) (§ 1983 claims are goverened by the statute of limitations for personal injury claims in the state where the injury occurred); 735 Ill. Comp. Stat. 5/13-202 (statute of limitations for personal injury claims is two years). The defendants acknowledge that the court rejected the argument when presented in support of their motion to dismiss, but bring it again because the court now has the benefit of "a full evidentiary record." Reply [113-1] at 2.

As the court detailed in its order denying the defendants' motion to dismiss, the Nances seek damages that flowed from the December 17, 2003, revocation of their liquor license, which occurred within two years of the November 30, 2005, filing of their complaint. Thus, their claim is not untimely. Nor is it untimely because some of the evidence in support of their claim involves conduct that occurred before November 30, 2003, outside the two-year statute of limitations period. Even untimely conduct is relevant to the extent it serves as "background evidence in support of a timely claim." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002). Here, the Nances' evidence of conduct that occurred outside the limitations period is relevant because it bears on the issue of whether the defendants' conduct within the limitations period—namely, the revocation of the Nances' liquor license—was motivated by race.

Accordingly, the defendants are not entitled to summary judgment based upon the 2-year statute of limitations.

### III.    Claim Against City of Elgin (Count I)

Next, the defendants contend that the city of Elgin is entitled to summary judgment because the Nances have failed to identify any evidence of a pattern or practice of discrimination, and therefore cannot establish their claim of race discrimination under the Equal Protection Clause. To establish racial discrimination under the Equal Protection Clause, the Nances must identify evidence that shows the defendants singled them out for unequal treatment based on their race or enforced a law or policy that makes irrational distinctions between groups of people. *See Bell v. Duperrault*, 367 F.3d 703, 707 (7th Cir. 2004).

The defendants argue that they are entitled to summary judgment because there is no evidence that the defendants' conduct was motivated by race. The argument is at odds with the record. For instance, the Nances have identified evidence that mayor Schock referred to their predominantely African-American clientele as "those people" while declaring that he no longer wanted "those people" downtown. *See DeWalt v. Carter*, 224 F.3d 607, 612 n.3 (7th Cir. 2000) ("use of racially derogatory language is . . . strong evidence of racial animus, an essential element of any equal protection claim"). The Nances also have evidence that mayor Schock told them that no liquor-only licenses were available, even though a short time later the owners of the Martini Room, who are not African-American, obtained a liquor-only license. The Nances' evidence creates a disputed question of fact over whether the defendants' conduct was motivated by race.

But the more fundamental problem with the defendants' argument is that it is beside the point. What matters is not whether the Nances have evidence of racial animus among the individuals, but rather whether they have evidence of a discriminatory policy. As a municipality, the city of Elgin cannot be held liable for the conduct of its employees under § 1983 under the theory of *respondeat superior*. *See Monell v. Dept. of Soc. Servs.*, 436 U.S. 658, 691 (1978). Therefore, evidence is material to the claim against Elgin only if it is evidence of (1) an express policy, (2) a widespread practice, or (3) conduct of a person with final policymaking authority. *See id.*; *Estate of Sims ex rel. Sims v. County of Bureau*, 506 F.3d 509, 514-15 (7th Cir. 2007). Though the defendants briefly acknowledged the correct analysis, they never developed any argument that the Nances have failed to identify evidence of an express policy, practice, or the decision of a final policymaker of the city of Elgin.

By failing to analyze the claim against the city of Elgin under the factors set forth in *Monell*, the defendants have failed to establish that the undisputed material facts compel judgment in their favor. Accordingly, their motion for summary judgment on Count I is denied.

## II.     Individual Claim Against Former Chief Miller (Count III)

The defendants argue that to succeed on the claim against former police chief Miller, the plaintiffs must identify evidence of conduct undertaken by Miller himself, not merely conduct of officers who worked under him. *See Davis v. Zirkelbach*, 149 F.3d 614, 619 (7th Cir. 1998) ("Davis has made no showing that [police chief] Gann had any knowledge whatever about this particular incident; thus, he cannot show that [police chief] Gann intentionally violated his constitutional rights. ").

In response, the Nances do not identify conduct by Miller himself. Instead, they argue that Miller is liable under § 1983 because he *must* have known about the conduct of the officers he supervised who surrounded the jazz club in their squad cars. However, as noted above, Miller is not liable under § 1983 based solely on the conduct of officers he supervised, and the Nances have identified no other evidence that Miller knew of the officers' conduct.

Accordingly, Miller is entitled to summary judgment on Count III.

## III.    Individual Claim Against City Attorney Kozal (Count IV)

Finally, the defendants seek summary judgment on the individual claim against city attorney Kozal, arguing that the conduct alleged against him is either (1) untimely, or (2) covered by prosecutorial immunity. Under the doctrine of prosecutorial immunity, a government attorney is absolutely immune for his or her role in initiating proceedings against another party for municipal or criminal violations. *See Smith v. Power*, 346 F.3d 740, 742 (7th Cir. 2003) (attorney entitled to absolute immunity when acting as an "advocate for the State," but not when acting as an investigator or for other conduct "unrelated to the preparation and initiation of judicial proceedings.").

The Nances respond by identifying conduct by Kozal other than initiating the proceedings that culminated in the revocation of their liquor license, which they do not dispute is covered under prosecutorial immunity. The other, allegedly non-prosecutorial conduct the Nances identify includes the following:

1. he "told the Nances they would have to have a food component to the Jazz Club;"

2. he "drafted the Class U license;"

3. he told Anthony Nance that "he did not want 'those people' downtown;"

4. he "told the Nances that if they retained an attorney in regards to the Stipulation and Agreed Order that the Jazz Club would be shut down,"

5. he "selectively enforced City ordinances against the Nances based on their race,"

Page 5

6. he "acted almost exclusively through his investigative powers in putting together a trumped up case against the Nances," and

7. he exercised his "administrative powers, such as drafting the liquor license, which caused the Nances to incur substantially more expensive then [sic] similarly situated non African-American club owners."

Response [107-1] at 15.

The Nances efforts to survive summary judgment on the claim against Kozal are unavailing for two reasons. First, their discussion of the claim against Kozal includes not a single citation to evidence in the record. As a result, the court has no basis to know whether the record contains any evidence to support their assertions, or to evaulate whether or not Kozal's alleged conduct was prosecutorial in nature. Therefore, the Nances have failed to meet their burden to identify evidence in the record that creates a disputed question of material fact. *See Brothers Food & Liquor, Inc. v. United States*, 626 F. Supp. 2d 875, 880 (N.D. Ill. 2009) (district courts are not obligated to scour the record to find disputes of material facts).

Second, as best as the court can tell given the lack of record citations, except for the revocation of the liquor license, the remaining conduct occurred outside the two-year statute of limitations period. The untimely conduct cannot serve as a basis of liability against Kozal individually (though, as detailed in the earlier discussion about the statute of limitations, it can serve as background evidence that conduct within the limitations period was racially motivated).

Thus, the only timely conduct by Kozal that the Nances have identified in his role in getting their liquor license revoked, which was prosecutorial in nature and therefore covered under prosecutorial immunity. Accordingly, Kozal is entitled to summary judgment on Count IV.

## CONCLUSION

For the reasons stated, the defendants' motion for summary judgment is granted in part and denied in part as follows: summary judgment is granted on Counts III and IV, and denied on Count I. The parties shall report for a status hearing on Tuesday, November 10, 2009, at 11:00 a.m., and shall come prepared to set a date for trial. By the date of the status hearing, the parties are also directed to jointly contact the magistrate judge's chambers to schedule a settlement conference.

ENTER:
DATE: November 2, 2009

_____
Blanche M. Manning
United States District Judge